Filed 3/8/22

**CERTIFIED FOR PUBLICATION**


**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**


|  |  |
|---|---|
| LAURA WHITE, | |
| Plaintiff and Respondent, | E076352 |
| v. | (Super.Ct.No. PRIN2000361) |
| DEBRA WEAR, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. John G. Evans, Judge. Affirmed in part; reversed in part with directions.

Herzog, Yuhas, Ehrlich & Ardell, Ian Herzog and Evan D. Marshall for Defendant and Appellant.

Sheppard, Mullin, Richter & Hampton, Adam F. Streisand, Nicholas J. Van Brunt and Valerie E. Alter, for Plaintiff and Respondent.

The parties to this appeal are no strangers to this court. This case is yet another skirmish in a long series of disagreements about the control of the multi-million-dollar

1

estate[1] of nonagenarian[2] Thomas S. Tedesco.[3]  Plaintiff and respondent Laura White is one of Thomas's three biological daughters and a cotrustee of his living trust. (*Conservatorship of Tedesco* (Sept. 19, 2019, E070316) [nonpub. opn.] review denied Dec. 18, 2019, S258835 (*Conservatorship*, E070316).)  Defendant and appellant Debra Wear aka Debbie Basara Wear is one of Thomas's stepdaughters.  In 2013, Thomas suffered serious health issues, which resulted in significant cognitive impairment, leaving him susceptible to being unduly influenced by anyone close to him.  Gloria Tedesco, Thomas's second wife, began denying White and her sisters access to their father, causing him to believe that they were stealing from him.  Wear assisted Gloria, her mother, in unduly influencing Thomas via contacting, or facilitating access to, attorneys in order to change Thomas's estate plan to disinherit his biological family in favor of Gloria and her family.  Thus, on August 13, 2015, a permanent conservator of Thomas's estate was appointed.

Despite the existence of the conservatorship, Wear continued to assist Gloria in taking actions to unduly influence Thomas to change his 30-plus-year estate plan. Consequently, upon White's petition, the superior court issued an elder abuse restraining order (EARO), restraining Wear for three years from, among other things, financially

---

[1] On December 31, 2005, Thomas's estate was valued at $40,474,997.

[2] Thomas was born on April 27, 1926.

[3] We refer to some of the parties by their first names to avoid confusion.  We mean no disrespect in doing so.  (*Estate of O'Connor* (2018) 26 Cal.App.5th 871, 875, fn. 2.)

2

abusing Thomas, contacting him (either directly or indirectly), facilitating any change to his estate plan, coming within 100 yards of him, and possessing any guns, other firearms, and ammunition. (Welf. & Inst. Code,[4] § 15657.03.) Wear contends the EARO is void because (1) the judge was disqualified and (2) he violated due process by substantially amending the allegations in the petition and prohibiting her from possessing firearms and ammunition. She further asserts the petition fails to state a cause of action for elder financial abuse. We agree the court erred in including a firearms and ammunition restriction in the EARO and direct the court to strike it. Otherwise, we affirm.[5]

---

[4] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[5] On November 5, 2021, this court reserved ruling on Wear's October 29, 2021 request for judicial notice of the following matters: (1) The record on appeal in *Conservatorship*, E070316; (2) the petition for writ of mandate in *Carpenter v. Superior Court* (*Wilson et al.*) (Aug. 23, 2017, E068946); (3) the petition for writ of mandate in *Tedesco v. Superior Court* (*White et al.*) (Sept 12, 2019, E073287); and (4) the petition for writ of mandate in *Tedesco v. Superior Court* (*White et al.*) (Feb. 24, 2020, E074712).

White opposes the request on the grounds that these "voluminous records . . . were never presented to the trial court, to defeat an argument that White did not make." White asserts that she "argued that substantial evidence established that Wear abused [Thomas]," and that the "substantial evidence consisted of a twenty-six page sworn statement, attaching nearly 500 pages of exhibits," one of which is this court's nonpublished opinion in *Conservatorship*, E070316, which "succinctly and accurately set[s] forth certain background information, including prior bad acts of Wear and those acting in concert with her."

Wear's request for judicial notice is granted in part and denied in part. We take judicial notice of one document only, our nonpublished opinion in *Conservatorship*, E070316. (Evid. Code, §§ 452, subd. (d), 459; Cal. Rules of Court, rule 8.1115(b)(1).) The other documents and records identified by Wear were never presented to the superior court in support of, or to defeat, the EARO. Thus, we deny her request for judicial notice of them.

3

# I. PROCEDURAL BACKGROUND AND FACTS

*A. Background History of the Parties.*

Thomas obtained his wealth through the sale of the family business and the purchase of commercial properties. In 1988, he and his late wife Wanda created an estate plan to benefit their three daughters, White, Sandra Kay, and Julie Bas, and their grandchildren. In 1993, Thomas and Wanda created TW Tedesco Properties, L.P., a California limited partnership, and the partnership interests were subsequently transferred to the Tedesco Family Trust. Wanda died in 2002, and the Tedesco Family Trust was divided into five separate trusts, including a survivor's trust, which was renamed the Thomas S. Tedesco Living Trust (the Living Trust). (*Conservatorship*, E070316.)

On March 25, 2007, Thomas married Gloria (nee Basara) who had two daughters from a prior relationship, Wear and Wendy Basara (Wendy). Their marriage was subject to prenuptial and postnuptial agreements because both Thomas and Gloria entered the marriage with multi-million dollar estates. On February 11, 2011, Thomas appointed his three daughters as his "true and lawful attorneys in fact . . . to act in any lawful way for [him] and in [his] name, place and stead and for [his] use and benefit as authorized." Thomas's three daughters were authorized to transfer trust assets and file any necessary tax returns, and if a conservatorship was needed, Thomas nominated them to serve, acting by majority vote. In September 2012, W. Mae, LLC, a California limited liability company (W. Mae), was created and Thomas gifted the Living Trust's general partner's interest in TW Tedesco Properties, L.P. to W. Mae. On June 5, 2013, Thomas resigned as trustee of the Living Trust, and his three daughters began to serve as successor

4

cotrustees.  (*Conservatorship*, E070316.)  On June 29, 2013, Thomas signed an amendment to the Living Trust, prepared by his family/estate plan attorney Burton A. Mitchell (Mitchell), which made the Living Trust irrevocable and unmodifiable unless Thomas and his daughters consented in writing.

During the first six years of Thomas and Gloria's marriage, no issues were raised regarding Thomas's estate plan, which favored his biological heirs.  However, in Fall 2013, after undergoing multiple surgeries, Thomas became intellectually impaired and susceptible to being unduly influenced.  He ended the decades-long relationship with Mitchell, who stated:  "[I]t was very difficult to communicate with his client [(Thomas)], as Gloria seemed to be blocking the calls.  When [Mitchell] called, either [Thomas] was never there or someone else was on the phone.  [Mitchell] related that he heard other voices in the background, particularly Gloria, telling Thomas what to say [and Mitchell] ha[d] seen scripts written for [Thomas] regarding what he [was] to say to his attorney."  At the same time, White and her sisters were denied access to their father.  A housekeeper, Virginia Winn, confronted Gloria and said, ""'You can't keep the girls from seeing their dad.  They're not stupid!'""  Gloria responded, "I don't care."  Gloria told Thomas that his daughters were "being bad" to her, blocked his communication with his family, and attempted to erase them from his memory by removing photographs of them.  Gloria prepared scripts[6] for Thomas to say to Mitchell or his daughters and caused

---

[6] Thomas was directed to tell Mitchell the following:  "I have hired another law firm to represent me in regards to my conservatorship—I don't want your firm to represent me in this matter"; "[h]ave my wife own the house outright.  [¶]  It simplifies things.  [¶]  I want Gloria to own this house outright"; and "[d]isinherit my children."

him, for the first time, to express a desire to leave 75 percent of his estate to Gloria and 25 percent to charity.

*B. The Conservatorship.*

Concerned about Thomas's health and Gloria's actions, on May 2, 2014, White petitioned for the appointment of a conservator of Thomas's person, and later amended the petition to seek a conservator of his estate. Undeterred by White's petition for conservatorship of Thomas's estate, Gloria and Wear continued to influence Thomas to change his estate plan. Thus, on January 14, 2015, White applied for a restraining order against Wear on the grounds that she was "'scheming to sabotage [Thomas's] relationship with his daughters, attempting to have [Thomas] amend his estate plan to favor Gloria, and trying to have [Thomas's] daughters removed as trustees of the relevant trusts.'" On January 15, 2015, White obtained a temporary restraining order (TRO) against Wear requiring her to refrain from discussing the issues of the conservatorship or Thomas's estate plan, or facilitating his access to any bank, accountant, attorney, or financial planner regarding the conservatorship or his estate plan. However, because Wear did not accept service of the TRO, service of process was not completed and, as a result, there was no hearing on the restraining order.[7]

---

[7] White also sought a restraining order against Wendy, Wear's sister. On February 11, 2015, Wendy stipulated that she would not discuss within the presence of Thomas the conservatorship of his estate, his estate plan, or his financial affairs, and she would not take or accompany him or be present with any banker, accountant, attorney, financial planner, or any person for any reason related to his conservatorship, his estate plan, or the financial management of his affairs.

On June 15, 2015, after a contested trial, the probate court concluded a temporary conservator of Thomas's estate was necessary because Thomas was mentally deficient and "very susceptible to being unduly influenced."[8] Thus, it appointed Kenneth F. Jenkins as the temporary conservator of Thomas's estate  A permanent conservator of Thomas's estate was appointed on August 13, 2015.  Nonetheless Wear, a paralegal for Russell Davis (R. Davis), facilitated Thomas's communications with R. Davis who repeatedly requested to be appointed counsel for Thomas.  (*Conservatorship*, E070316.) Each of R. Davis's requests for appointment were denied by the probate court, which explained that the "'history of this case reflects a crucial need that independent counsel represent [Thomas], meaning that counsel be not related with or retained by family

---

[8]  The court opined that the case was "unusual" because Thomas's "needs are adequately met by existing estate planning documents prepared by the conservatee during the period of [his] full capacity."  The court noted that Thomas's lack of capacity was attested to by his treating physician, Richard G. Byrd, M.D., and neurologist Ivor J. Nazareth, M.D. and "clearly shown and confirmed by the very recent, credible, and compelling report of Geriatric Psychiatrist, David W. Trader, appointed by the court as [an Evidence Code section] 730 expert by stipulation of all parties."  The court further noted that the appointment of a temporary conservator was warranted as "there is evidence from which a reasonable inference may be made that undue influence (or at least attempts at such) of [Thomas] has occurred through persons yet to be determined." More specifically, the court noted that "about one year ago[, on September 9, 2014,] (about the time, or soon after, this matter was commenced and after the capacity reports of Dr. Byrd and Dr. Nazareth were prepared)" Thomas, accompanied by Gloria, attempted to withdraw $500,000 from a bank account of a business entity that was no longer under his control.

members who may have or might be involved in influencing the conservatee and retained counsel.'"[9]  (*Conservatorship*, E070316.)

By 2017, R. Davis requested authority for Thomas to engage the services of the Herzog, Yuhas, Ehrlich & Ardell (The Herzog firm) and Joseph Davis (J. Davis).[10] (*Conservatorship*, E070316.)  The Herzog firm and R. Davis have repeatedly requested the probate court terminate the conservatorship, and they have initiated several actions against Thomas's biological family members and in-laws accusing them of misappropriating his assets.  (*Conservatorship*, E070316.)  Moreover, Wear has remained close to Thomas, including attending, and sitting next to him at, his depositions.  In

---

[9]  In June 2016, Thomas requested the appointment of R. Davis as independent counsel, but on August 4, 2016, the probate court appointed Jeremy J. Ofseyer. (*Conservatorship*, E070316.)  Within months of being appointed, Ofseyer moved to withdraw as Thomas's court-appointed counsel because Gloria objected to his representation of Thomas.  Gloria claimed that Ofseyer had a conflict because he had a meeting "'several years ago with [Gloria], her attorneys, and representatives.'"  Ofseyer "'disagree[d] that there [was] a disqualifying conflict' and concluded there was 'apparently a disagreement' with Gloria about 'the contents and implications of these calls.'"  R. Davis filed a second request to be appointed counsel for Thomas.  On December 9, 2016, the court permitted Ofseyer to withdraw but denied R. Davis's request to take his place.  Instead, the court appointed Julia Burt as Thomas's counsel.

[10]  R. Davis, The Herzog firm, and J. Davis are collectively referred to as non-court appointed counsel.  Non-court appointed counsel interfered with Burt's attorney-client relationship with Thomas and, on June 22, 2017, she asked to be relieved as counsel for Thomas on the grounds "'non-Court appointed counsel has caused an irreparable breakdown of her attorney/client relationship with [Thomas], and therefore she can no longer adequately represent him.'"  Burt was unable to meet or speak with Thomas; however, she received "'faxes from [him] wherein it became clear that [he] did not want [her] to represent him.'"  On August 2, 2017, R. Davis filed his third request to be appointed counsel for Thomas.  R. Davis also prepared a declaration for Thomas to sign in support of the request.  The court again denied R. Davis's request.  (*Conservatorship*, E070316.)

8

Thomas's September 11, 2018 deposition, Thomas described Wear as his "sweetheart" and claimed to have borrowed $40,000 or $50,000 from her.

   *C. The Petition for an Elder Abuse Restraining Order.*

   On April 27, 2020, White, as a cotrustee of the Living Trust, petitioned the superior court for the EARO against Wear and several others,[11] based on their continued efforts to unduly influence Thomas to change his estate plan for their benefit. Their latest action involved the creation of a purported amendment to the Living Trust, which was signed on January 20, 2020, without notice to, or approval of, the conservator of Thomas's estate, the probate court, or the trustees of the Living Trust. The purported amendment provides that Thomas is disinheriting his biological children and grandchildren in favor of Gloria and her daughters, Wear and Wendy.[12] On March 12,

---

[11] The others include Gloria, Wendy, Gloria's friend Stephen Carpenter (Carpenter), lawyers from the Herzog firm (Ian Herzog and Evan D. Marshall), R. Davis, and J. Davis. This appeal concerns Wear only.

[12] The amendment, in part, provides: "This 2020 Amendment to the Amended and Restated Thomas S. Tedesco Living Trust is made this 20th day of January, 2020, and executed by THOMAS S. TEDESCO as Trustor in order to make revisions to the Thomas S. Tedesco Living Trust.

"On March 27, 2019, I, Thomas S. Tedesco, executed a document to revoke my Trust in order to nullify the Third Amendment to my Trust which purportedly was executed by me but is not in accord with my wishes. I never agreed or approved of the Third Amendment and, if I did sign it, it was never explained to me by my attorney or my daughters. It was signed by me at the request of one of my daughters. The Third Amendment does not reflect my intent. Therefore, my intent was to revoke the trust in order to have my estate be distributed in accordance with my will as amended.

"I have been advised that I may not have the power to revoke my Trust. Therefore, in the event that such revocation is not allowed and, to the extent that I am able to do so, I hereby amend my Trust in order to be sure that my wishes concerning my estate after my death are honored."

2020, R. Davis sent a letter[13] to Thomas's daughters and their attorney to inform them that Thomas had changed the designated beneficiaries of the Living Trust. According to the purported 2020 amendment, 75 percent of the entire trust estate is to be distributed to Gloria upon Thomas's death, or to Gloria's daughters if Gloria does not survive Thomas. It also provided that Carpenter and Cynthia Finerty would serve as cotrustees.

Because of the purported 2020 amendment, White requested that Wear be restrained from financially abusing Thomas, contacting him (either directly or indirectly), being within 100 yards of him, living or being in his home, and making any change, or facilitating any changes to Thomas's estate plan, including taking Thomas to any attorney, accountant, financial planner, or banker, or by acting (or purporting to act) as Thomas's attorney or representative.

On June 7, 2020, Wear was served with White's petition in Illinois. She did not file any response or paperwork, nor did she appear at the hearing. Rather, on July 29, 2020, the Herzog firm (Marshall) filed a document denominated as a "NOTICE OF NON-SERVICE," which alleged that Wear had "not been served with process" and, in the event she is served, she would file a special motion to strike under Code of Civil Procedure section 425.16.[14]

---

[13] The reference initials at the bottom of the letter identify the person who typed the letter as "djw."

[14] According to her opening brief, Wear "observ[ed] on the court's docket a purported *Proof of Personal Service*" of White's petition.

R. Davis appeared at the July 30, 2020 hearing and represented himself. When the superior court (Hon. John G. Evans) informed him that he did not have to be there, he replied, "Okay. I can also tell you about Debra Wear. She lives in Chicago." He denied representing her but claimed to "have knowledge." The court informed him to wait outside until he was called as a witness; however, he declined and explained that he would not be here.[15] The matter proceeded without Wear. White's counsel informed the

---

[15] The reporter's transcript, in relevant part, provides: "THE COURT: I'm going to start with a bit of housekeeping. I have two matters left on my 1:30 calendar. The first one is the PRIN2000361, which is the temporary restraining order against Debra Wear.

"Is anyone here on that case?

"MR. STREISAND: Yes, Your Honor.

"THE COURT: We'll start with who represents the petitioner.

"MR. STREISAND: Good afternoon, Your Honor. Adam Streisand for the petitioner. [¶] . . . [¶]

"MR. DAVIS: Russell Davis, Your Honor.

"THE COURT: Who do you represent, Mr. Davis? [¶] . . . [¶]

"MR. DAVIS: I'm representing myself.

"THE COURT: All right. So you're welcome to be seated.

"MR. STREISAND: Your Honor, I'm not sure I understand why Mr. Davis is here.

"THE COURT: I'll handle that. . . . [¶] Mr. Davis, your matter was PRIN2000353, and the 170.6 was granted this morning, so your matter is not on calendar.

"MR. DAVIS: Correct. We weren't clear if we were supposed to show up or go elsewhere or wait for an assignment.

"THE COURT: As soon as I sign that order, I won't have any jurisdiction with the case. I can't refer it to anyone else. I have no decisionmaking involved. [¶] So I did request my courtroom assistant to call people who are representative of counsel, and let everyone know that the 170.6's have been granted on the Russell Davis case, the Gloria Tedesco case, the Stephen Carpenter case, and the Ian Herzog case. You don't have to be here.

"MR. DAVIS: Okay. I can also tell you about Debra Wear. She lives in Chicago. [¶] . . . [¶]

"THE COURT: . . . You don't represent her, do you?

"MR. DAVIS: No, but I have knowledge.

*[footnote continued on next page]*

court, and the court found, that Wear was personally served in Illinois on June 7, 2020.**16** Regarding the requested order, the court noted that the "proposed order, which was printed out under the personal conduct order, has checked the box 'other,' and it refers to attachment 6(a)(4)." White's counsel agreed, noting that it is marked as attachment 11(c). The court relabeled the attachment as 6(a)(4) and added it to the proposed order. Attachment 6(a)(4) stops Wear from making or facilitating any changes to Thomas's estate plan. The court then stated, "Because Ms. Wear is not here, she must be personally served with the order towards the equitable conditions because the allegations extend beyond financial abuse. I also checked the box that she does not—does not possess any firearms, it's mandatory. [¶] . . . [¶] . . . This order says this does only involve elder abuse." White's counsel replied, "It's not just financial abuse, it's also—we said that as a mistake—it's mental suffering, harassment, intimidation." The court changed the language to state that "this case 'does not involve solely financial abuse.'"

According to the EARO, Wear was ordered to not abuse (financial or otherwise) or contact (directly or indirectly) Thomas; to not make, or facilitate, any change to

---

"THE COURT: If you're a witness, you can wait outside, and I'll call you at the time I call witnesses.

"MR. DAVIS: I will not be here, Your Honor. You just stated I'm excused, correct?

"THE COURT: You are excused, yes.

"MR. DAVIS: Okay."

**16** Wear does not challenge this finding on appeal. Rather, she claims that "[o]n July 29, 2020, after observing on the court's docket a purported *Proof of Personal Service*, [she] filed a *Notice of Non-Service*, denominated as a special appearance." On appeal, it appears that her primary challenge to service concerns the petition that was "amended" by the superior court at the hearing.

Thomas's estate plan; to stay at least 100 yards away from him; to move out and not return to his home in Indian Wells, California; and to not own, possess, have, buy or try to buy, receive or try to receive, or in any other way get guns, other firearms, or ammunition.

On August 14, 2020, Marshall, specially appearing for Wear, filed a peremptory challenge to Judge Evans under Code of Civil Procedure section 170.6, claiming that the judge "is prejudiced against [Wear] and her attorneys and interests such that she cannot, and I [(Marshall)] believe that she cannot, have a fair and impartial trial or hearing before such Judge." Marshall declared that "Judge Evans has been responsible for a pattern of irregular judicial intervention and interference with the right to hearing in this and related cases which affect the instant case." He then identified various cases involving Carpenter, Ian Herzog, Gloria, and the conservatorship, wherein motions to strike were rejected. According to the register of actions, on August 5, 2020, Wear filed two motions: (1) a motion to quash service and vacate the EARO for lack of personal service, and (2) a special motion to strike the request for a restraining order. Subsequently, on August 14, 2020, Judge Evans granted the peremptory challenge and the case was reassigned to another judge.

## II. ANALYSIS

### A. *Applicable Law.*

The overarching goal of the Elder Abuse and Dependent Adult Civil Protection Act (§ 15600 et seq.; Elder Abuse Act), as articulated by the Legislature, is to protect vulnerable elderly adults from abuse and neglect. (§ 15600; *Bookout v. Nielsen* (2007)

13

155 Cal.App.4th 1131, 1139 (*Bookout*).)  Section 15657.03 governs the issuance of protective orders under the Elder Abuse Act.  For purposes of the Elder Abuse Act, an "'[e]lder'" is a California resident, 65 years of age or older.  (§ 15610.27.)  "'Abuse of an elder'" is defined as "(1) Physical abuse, neglect, abandonment, isolation, abduction, or *other treatment with resulting* physical harm or pain or *mental suffering*.  [¶] . . . [¶] (3) Financial abuse, as defined in Section 15610.30."  (§ 15610.07, subd. (a)(1), (a)(3), italics added.)

 "'Financial abuse'" occurs when a person or entity "[t]akes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating, obtaining, or retaining, real or personal property of an elder or dependent adult by *undue influence*, as defined in Section 15610.70."  (§ 15610.30, subd. (a)(3), italics added.)  Undue influence, a form of elder financial abuse (§ 15610.30, subd. (a)(3)), is defined as "*excessive persuasion* that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity."  (§ 15610.70, subd. (a), italics added.)  In determining whether undue influence was used, the statute directs a court to consider four factors:  (1) the vulnerability of the victim; (2) the influencer's apparent authority, i.e., a fiduciary or family relationship; (3) the influencer's actions or tactics, i.e., controlling the victim's life, interactions with others, using affection, or initiating changes in personal or property rights, particularly via haste or secrecy; and (4) the equity of the result, i.e., any divergence from the victim's prior intent or course of conduct or dealing, and "the appropriateness of the change in light of the length and nature of the relationship." (§ 15610.70, subd. (a)(1)-(a)(4).)

14

We review the superior court's issuance of a protective order under the Elder Abuse Act for abuse of discretion, and we review the court's underlying factual findings under the substantial evidence test. (*Bookout*, *supra*, 155 Cal.App.4th at p. 1137.) The level of proof required for a protective order under the Elder Abuse Act is a preponderance of the evidence. (*Gdowski v. Gdowski* (2009) 175 Cal.App.4th 128, 137; *Bookout*, at p. 1138; see also *Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 334 [construing similar protective order provision of Domestic Violence Prevention Act (Fam. Code, § 6200 et seq.)].)

*B. The Restraining Order Is Not Void.*

Wear contends the EARO is void because the judge was disqualified and he violated due process by substantially amending the allegations in the petition and prohibiting her from possessing firearms and ammunition. Although we reject Wear's contention that the EARO is void, we agree that the superior court erred in prohibiting her possession of firearms and ammunition.

*1. Wear's post hoc peremptory challenge does not void the EARO.*

Two weeks *after* issuing the EARO, Judge Evans granted Wear's peremptory challenge under Code of Civil Procedure section 170.6.[17] She argues that, by granting

---

[17] Following the issuance of the EARO, Wear filed a Code of Civil Procedure section 425.16 anti-SLAPP motion in this matter. Believing that Judge Evans was prejudiced against her, she also filed a Code of Civil Procedure section 170.6 declaration to remove him from hearing her anti-SLAPP motion. With respect to the EARO, her section 170.6 declaration was untimely. "The limited right of section 170.6 does not . . . permit a peremptory challenge to be filed or accepted absent a pending trial, a pending hearing involving a contested issue of fact or law, or an all purpose assignment." (*Grant*

*[footnote continued on next page]*

15

her peremptory challenge, the judge did not dispute the facts supporting disqualification, and since the "facts on which prejudice [was] based" pre-dated the EARO, the order is void. Not so.

Wear filed a peremptory challenge under Code of Civil Procedure section 170.6, which does not require her to "'establish prejudice as a matter of fact.'" (*Mendoza v. Superior Court* (2021) 65 Cal.App.5th 988, 995.) Section 170.6, subdivision (a)(1), provides that a "judge . . . shall not try a civil . . . action or special proceeding of any kind or character nor hear any matter therein that involves a contested issue of law or fact when it is established . . . that the judge . . . is prejudiced against a party or attorney or the interest of a party or attorney appearing in the action or proceeding." "*Section 170.6* '*permits* a party to obtain the *disqualification* of a judge *for prejudice, based solely upon a sworn statement, without being required to establish prejudice as a matter of fact* to the satisfaction of the court.' [Citation.] '*When a litigant has met the requirements of section 170.6, disqualification of the judge is mandatory*, without any requirement of proof of facts showing that the judge is actually prejudiced.' [Citation.] 'Permitting a party's belief that the judge is prejudiced to justify disqualification was intended to "preserve public confidence in the impartiality of the courts."'" (*Mendoza v. Superior Court*, at p. 995, italics added.)

---

*v. Superior Court* (2001) 90 Cal.App.4th 518, 526; see *Briggs v. Superior Court* (2001) 87 Cal.App.4th 312, 318 [trial court lacks authority to waive the untimeliness of a § 170.6 affidavit].)

16

Citing several cases, Wear argues that Judge Evans's granting of her Code of Civil Procedure section 170.6 challenge voided the EARO. However, the cases that Wear relies upon are inapplicable to the facts before this court because they invoke Code of Civil Procedure section 170.3 or involve situations of prejudicial or biased conduct not present in this case. (*Hayward v. Superior Court* (2016) 2 Cal.App.5th 10, 37 [disqualification under § 170.3 proper where judge failed to disclose professional relationship with lawyers in the case]; *People v. Freeman* (2010) 47 Cal.4th 993, 999-1000 [§ 170.3 prohibits a recused judge from further participating in the proceeding unless his or her disqualification is waived by the parties]; *Flier v. Superior Court* (1994) 23 Cal.App.4th 165, 171 [judge's use of the term "'good boy'" in another defendant's proceeding was taken out of context and did not support disqualification under §§ 170.1 and 170.3] *Christie v. City of El Centro* (2006) 135 Cal.App.4th 767, 775-780 [nonsuit was null and void because judge was disqualified under § 170.1 after discussing the case with a previously disqualified judge]; *Williams v. Pennsylvania* (2016) 579 U.S. 1, 6, 21 [when a judge had significant, personal involvement as a prosecutor in a critical decision regarding a defendant's case there is an impermissible risk of actual bias] *Caperton v. A. T. Massey Coal Co*. (2009) 556 U.S. 868, 881 [judge had received campaign contributions in an extraordinary amount from and through the efforts of the board chairman/principal officer of defendant corporation]; *Dodds v. Commission on Judicial Performance* (1995) 12 Cal.4th 163, 167-168, 176-177 [judge engaged in willful misconduct by interfering in a law enforcement investigation and giving the appearance of rudeness and prejudgment in the handling of cases]; *Giometti v. Etienne* (1934)

219 Cal. 687, 688-689 [Cal. Supreme Court order void because one of the justices who signed it did not realize his relative represented petitioner].) While orders issued by a judge disqualified under section 170.3 may be subject to retroactive invalidation, the same is not true for orders issued by a judge who later disqualifies himself under section 170.6. A section 170.6 disqualification is a peremptory challenge to a judge based upon *a party's subjective view that a judge is biased*. In contrast, a section 170.3 disqualification is for cause, based on objective evidence of bias.

Nonetheless, by labeling her challenge as a Code of Civil Procedure section 170.6 disqualification but inserting text that specifies "acts relevant to actual and apparent bias," Wear argues that her challenge is a section 170.3 disqualification (involving "constitutional as well as statutory standards") and Judge Evans treated it as such. She contends that "[i]t is the substance of a pleading, not its label, that governs its interpretation and effect." She further asserts that she could not file a section 170.6 challenge prior to the hearing on the EARO because she had filed a motion to quash and the peremptory challenge would "have amount[ed] to a submission to the jurisdiction of the court, waiving the objection to service." We reject her contentions.

The parties to this appeal, along with their counsel, are not ignorant of the different statutory ways to disqualify a trial judge. This court has reviewed their petitions for writ of mandate challenging the denial of their (including Wear's) prior attempts to disqualify Judge Evans under Code of Civil Procedure sections 170.1 and 170.3. (See, i.e., *Gloria Tedesco et al. v. Superior Court* (*White et al.*) (Apr. 10, 2020, E074912) [denial of writ pet.]; *Thomas S. Tedesco et al. v. Superior Court* (*White et al.*) (Oct. 15,

18

2020, E075731) [denial of writ pet.]; and *Wear v. Superior Court* (*White et al.*) (Dec. 4, 2020, E075947) [denial of writ pet.], of which we take judicial notice under Evid. Code, §§ 452, subd. (d), 459.) These prior attempts demonstrate Wear and her counsel's knowledge and understanding of the relevant statutory authority to disqualify a judge. As White aptly notes, Wear "chose to avail herself of the 'automatic' procedure afforded by section 170.6." Her attempt to argue otherwise is disingenuous.

In short, Judge Evans's Code of Civil Procedure section 170.6 disqualification did not void the EARO.

 *2. The superior court correctly clarified the form allegations to include mental suffering, harassment, and intimidation but erred in prohibiting Wear from possessing firearms and ammunition.*

Next, Wear contends the EARO is void because the superior court violated due process by "substantially amending the petition to support unrequested relief." More specifically, she argues that White's only basis for relief was "financial abuse" but, at the hearing, the court expanded both the allegations (to include mental suffering, harassment, and intimidation) and the nature of relief available (to include firearms restraining order) "without notice to Wear." Although we do not find the EARO void, we agree that the court erred in expanding the relief to prohibit Wear from possessing firearms and ammunition.

In requesting the EARO, White utilized Judicial Council form EA-100. She checked the box that indicated the abuse was "**solely financial**" while also asserting that the harm or injury to Thomas (aka Tom) included "confusion and distress." White

19

specifically identified the harm and injuries as follows:  "*Tom is being harmed by this coordinated course of financial elder abuse*.  Tom's lack of capacity has been confirmed repeatedly by various doctors since the Fall of 2013 . . . .  Since then, *the undue influencers have preyed on Tom* 'with [*Tom*] *falling into dementia problems*' *in order* '*to affect a change in the estate plan*.' . . .  Meanwhile, non-appointed counsel, at least some of whom are on a contingency fee, have forum shopped for any Court that will unwittingly issue an order saying they can represent Tom.  However, '[t]here is substantial evidence that [Tom] has benefitted from the conservatorship of his estate[,]' . . . [and] non-appointed counsel's efforts to represent Tom harm him by undermining these benefits.  As the Court warned over three years ago, if non-appointed counsel 'continues to contact a person under conservatorship . . . it may start fitting under the elder abuse statute.' . . . .  [¶]  Now, . . . the undue influencers decided to go ahead anyway with what they wanted the Court to allow them to do:  have Tom sign an amendment to his Trust to benefit Gloria, [Wear], Wendy, and Carpenter.  If the [purported] 2020 Amendment were valid, it would supplant Tom's intent expressed in his estate plan **at all times while he had capacity**—for his Daughters and grandchildren to inherit his wealth (save for certain property to Gloria)—and instead disinherit them.  This would result in Gloria's and/or [Wear's] or Wendy's inheriting millions of dollars Tom never intended for them to receive, and would likely enrich 'Tom's' contingency-fee counsel.  *All of this has caused Tom confusion and distress for years, and continues to do so*."

Section 15657.03 includes the following language: "An order may be issued under this section, *with or without notice*, to restrain any person for the purpose of preventing a recurrence of abuse, if an affidavit shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse of the petitioning elder or dependent adult." (§ 15657.03, subd. (c), italics added.) "'Abuse of an elder'" includes "[f]inancial abuse" "or other treatment with resulting . . . mental suffering." (§ 15610.07, subd. (a)(1), (a)(3).) "'Mental suffering'" includes "*agitation, confusion*, . . . or *other forms of serious emotional distress* that is brought about by forms of . . . harassment . . . ." (§ 15610.53, italics added.)

According to White's declaration, Wear actively assisted Gloria in denying White and her siblings access to Thomas, while simultaneously causing him to believe that they—with the assistance of his attorney Mitchell—were stealing from him. While Thomas was agitated by thoughts that his daughters were stealing from him, Wear was able to unduly influence him by contacting, or facilitating access to, attorneys in order to change Thomas's estate plan to disinherit his biological family in favor of her mother (Gloria), her sister (Wendy), and herself. Wear further assisted Gloria in convincing Thomas that the creation of the conservatorship was another vehicle his daughters were using to steal his wealth. To prevent further elder abuse (specifically financial abuse via confusion and undue influence), White petitioned for a restraining order against Wear and served her with notice of the hearing.

21

At the hearing, the superior court considered White's declaration and the supporting exhibits, and then corrected the allegations identified in the standard judicial council form to accurately reflect the claims of mental suffering, harassment, and intimidation described in the declaration and supported by the evidence presented in the exhibits. Given the measures that Wear used to confuse Thomas (via accusations of wrongdoing against his biological daughters) and to unduly influence him (via controlling his access to specific people including the lawyer she works for as a paralegal), it was reasonable for the court to clarify the allegations of abuse identified in the petition if it did not expand the relief requested. (Code of Civ. Proc. § 580, subd. (a) ["The relief granted to the plaintiff, if there is no answer, cannot exceed that demanded in the complaint, . . . ; but in any other case, the court may grant the plaintiff any relief consistent with the case made by the complaint and embraced within the issue. The court may impose liability, regardless of whether the theory upon which liability is sought to be imposed involves legal or equitable principles."].) The inclusion of the words mental suffering, harassment, and intimidation in the allegations did not expand the relief requested;[18] however, the court's inclusion of a firearms and ammunition restriction did. (*Julius Schifaugh IV Consulting Services*, *Inc. v. Avaris Capital*, *Inc.* (2008) 164

---

[18] In her reply brief, Wear contends that "White's oral amendment was no mere clerical change. The emotional abuse charge was required to meet White's demand that Wear be ordered to move out of the house and to support the stay-away order." Wear's contention is misplaced. White's petition always sought an order requiring Wear to "stay at least 100 yards away from" Thomas and "to move out and not return to [his] residence." Thus, the superior court's clarification of the allegations—to include the words mental suffering, harassment, and intimidation—did not result in amending the petition or expanding the relief requested.

Cal.App.4th 1393, 1396 ["[T]he amount of damages awarded in excess of the demand was outside of the trial court's jurisdiction under Code of Civil Procedure section 580, and the original default judgment was void as to any amount over that."].)

The Elder Abuse Act defines abuse broadly.  Section 15657.03, subdivision (u)(1), provides that a "person subject to a protective order under this section shall not own, possess, purchase, receive, or attempt to receive a firearm or ammunition while the protective order is in effect."  However, this restriction on possession of firearms/ammunition is exempted if the protective order "issued under this section was made solely on the basis of financial abuse unaccompanied by force, threat, harassment, intimidation, or any other form of abuse." (§ 15657.03, subd. (u)(4).)  Here, White never alleged, argued, or provided evidence that Wear used force, threats, harassment, intimidation, or any other form of abuse to make Thomas change his estate plan.  Rather, the mental suffering, harassment, and intimidation that Wear is charged with involved nonphysical abuse designed to manipulate Thomas's affection toward his daughters.  Because there were no physically abusive or mentally intimidating acts against Thomas, we do not agree with the superior court's statement that a restriction on Wear's possession of firearms is "mandatory."  Instead, the restriction exceeds White's allegations and was therefore "outside of the [superior] court's jurisdiction under Code of Civil Procedure section 580." (*Julius Schifaugh IV Consulting Services*, *Inc. v. Avaris Capital*, *Inc.*, *supra*, 164 Cal.App.4th at p. 1396.)  We will therefore order the court to strike the firearms and ammunition restriction. (*Molinaro v. Molinaro* (2019) 33 Cal.App.5th 824, 831-833 [appellate court ordered trial court to strike provision of a

23

domestic violence restraining order which impermissibly infringed on constitutionally protected right of free speech].)

C. *The Petition States a Cause of Action for Financial Abuse.*

Finally, Wear contends the petition fails to state a cause of action for elder financial abuse because she "never took, or secreted anything from [Thomas], and it is not alleged that [she] had any property or assets to be returned to [him]" or that she wrongfully used. She further contends that "since undue influence is inducement to action, which the elder would not have otherwise undertaken, it cannot be undue influence to assist [Thomas in] adjudicating a well-founded civil or probate claim as he has desired for years." As we explain, we reject her contentions.

According to the petition, the financial elder abuse happened on or about March 12, 2020, when Thomas purportedly amended the Living Trust to disinherit his biological family in favor of Gloria, Wear, and Wendy. R. Davis informed White and her sisters, cotrustees of the Living Trust, about the purported 2020 amendment which, upon Thomas's death, distributes "75% of the entire Trust estate" to Gloria, and if she does not survive him, to her two daughters in equal shares. The purported 2020 amendment "purports to supplant Tom's intent expressed in his estate plan **at all times while he had capacity**—for his Daughters and grandchildren to inherit his wealth (save for certain property to Gloria)—and instead disinherit them." However, the purported amendment was executed by Thomas while his estate was under conservatorship and without notice to, or approval from, the conservator, the probate court, or White and her sisters as cotrustees of the Living Trust.

24

We note that Wear does not argue that the superior court abused its discretion in issuing the EARO, nor does she dispute that substantial evidence supports the order.[19] We, therefore, presume the EARO to be correct. (cf. *Lintz v. Lintz* (2014) 222 Cal.App.4th 1346, 1357 [trial court's findings of fact and conclusions of law contained in statement of decision are presumed correct when appellant fails to challenge].) We further presume the evidence supports the conclusion that Wear unduly influenced, or assisted in unduly influencing, Thomas to change his 30-years plus estate plan in favor of Gloria's wishes—which also favors Wear—and contrary to Thomas's wishes pre-conservatorship. (*Id.* at pp. 1354-1355 [undue influence may be established by circumstantial evidence], 1357; (*Hagen v. Hickenbottom* (1995) 41 Cal.App.4th 168, 182 [undue influence in testamentary act requires showing that proven circumstances are inconsistent with voluntary action of testator].) From this presumption, it follows that the petition stated a claim of financial elder abuse. But even without this presumption, the evidence establishes the undue influence required to state such a claim. The fact that Wear did not take, or possess, any of Thomas's real or personal property is irrelevant because elder financial abuse includes the taking of "any property right, including by

---

[19] In her reply brief, she asserts that the purported 2020 amendment does not qualify as financial abuse because there was no immediate separation of Thomas's assets from Thomas or his estate, and there is no allegation that she has taken any money or assets from him. She maintains that she "induced no restriction on [Thomas's] ability to alienate or encumber his assets, or to alter his trust and the ultimate disposition of trust assets. Only the daughters did this." Wear fails to acknowledge the facts that Thomas is under a conservatorship, the purported 2020 amendment significantly changes Thomas's 30-years plus estate plan by disinheriting his biological heirs—to Wear's benefit, and the purported 2020 amendment was not approved by the conservator, the probate court, or the cotrustees of the Living Trust.

means of . . . testamentary bequest, regardless of whether the property is held directly or by a representative of an elder." (§ 15610.30, subd. (c).)  Thus, Wear's procurement, or assistance in the procurement, of the purported 2020 amendment supports a claim for elder financial abuse sufficient to warrant a restraining order.

## III.  DISPOSITION

The part of the EARO prohibiting Wear from owning, possessing, having, buying or trying to buy, receiving or trying to receive, or in any other way getting guns, other firearms, or ammunition is reversed, and the superior court is directed to strike the provision from the EARO.  The EARO is affirmed in all other respects.  Each party shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)

CERTIFIED FOR PUBLICATION

McKINSTER
                                                                                                    J.

We concur:


RAMIREZ
                        P. J.


SLOUGH
                        J.

26